IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAMES E. WHITNEY                                                    PLAINTIFF

      v.                              Civil No.  14-5028

SERGEANT MORSE; SERGEANT
WHITTINGTON; NURSE RHONDA
BRADLEY; CORPORAL FOSTER;
CORPORAL MULVANEY; DEPUTY
WEISS BROCK; DEPUTY WORKMAN;
DEPUTY McNALLY; SHERIFF TIM
HELDER; DETECTIVE Y. SCHROCK;
ARAMARK CORRECTIONAL SERVICES
LLC; and DEPUTY SHEPHERD                                         DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*  The Plaintiff is incarcerated in the Washington County

Detention Center (WCDC) in Fayetteville, Arkansas.

Currently pending are two motions for summary judgment: the first motion (Doc. 66),

was filed on behalf of Aramark Correctional Services, LLC, the contract food provider for the

WCDC; the second motion (Doc. 71), was filed on behalf of the Washington County Defendants:

Sergeant Morse, Sergeant Whittington, Nurse Rhonda Bradley, Corporal Foster, Corporal

Mulvaney, Deputy Weissbrock, Deputy Workman, Deputy McNally, Sheriff Tim Helder,

Detective Y. Schrock, and Deputy Shepherd.

A hearing was held on October 27, 2015, to allow the Plaintiff to testify in response to

the pending summary judgment motions.  During the course of the hearing, it was determined

that additional information was needed prior to the resolution of the summary judgment motions.

The Court issued a subpoena for medical records to the Healing Arts Medical Center.  Doc. 109.

Additionally, both Plaintiff and the Defendants were directed to submit additional documents

-1-

and/or affidavits.   The additional information has been received and the summary judgment motions are ready for resolution.  *See* Docs. 114-118, 121-124, 130, 134, 136, 137-138.[1]

**I.  Applicable Standard**

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party."  RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 401 (8th Cir. 1995).  The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

The Court must view all evidence and inferences in a light most favorable to the nonmoving party.  See McCleary v. ReliaStar Life Ins. Co., 682 F.3d 1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).

---

[1] Plaintiff still maintains he has not received all discovery documents from the Defendants.  However, Defendants have repeatedly produced the documents sought that are in existence.  Some of the records Plaintiff seeks are from years not at issue in this case and/or are not relevant to the claims brought in this case.  For instance, the records regarding interaction between Detective Schrock and Teena Whitney are from 2012.

AO72A
(Rev. 8/82)

## II.  Background

Plaintiff asserts the following claims: (1) violation of Freedom of Religion (religious fast--threatened with disciplinary action if he did not eat); (2) failure of Aramark to provide a balanced and nutritional diet within his medical needs as a Type II diabetic and allergy to gluten;[2] (3) retaliation in retribution for complaints filed against Detective Y. Schrock; (4) conditions of confinement (having to sleep on the floor and overcrowding); (5)  posting of his picture and charges on the public web site violating his right to privacy and giving the appearance that he was guilty; (6) inadequate medical care (hernia, ice pick headaches, burning pain in right shoulder and arm, a metallic taste, and seizures); (7) foreign objects in his food on two occasions (a piece of wood and egg shells imbedded in an egg); and (8) denial of access to the courts.

Plaintiff testified that he was booked into the WCDC on October 17, 2013, and released in early June of 2014.  Plaintiff was booked in again on November 14, 2014, and has remained incarcerated at the WCDC to date.

## III.  Discussion

Section 1983 imposes civil liability upon one:

> who under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

42 U.S.C. § 1983.

Governmental actors may be sued in both their individual and official capacities. Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998).  Plaintiff has asserted both types of claims. With respect to the official capacity claims, "[i]t is well established that a municipality cannot

---

[2]Gluten is a protein found in wheat and other grains. http://www.medilexicon.com/medicaldictionary.php?t=37765 (accessed January 31, 2016).

AO72A
(Rev. 8/82)

be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor."

Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1214 (8th Cir. 2013).  To establish

official capacity liability under § 1983, "plaintiff must show that a constitutional violation was

committed pursuant to an official custom, policy, or practice of the governmental entity." Moyle

v. Anderson, 571 F.3d 814, 817 (8th Cir. 2009)(citation omitted).

Plaintiff was a pretrial detainee at all times relevant to this case.  "Although the Eighth

Amendment has no application until there has been a formal adjudication of guilt, the Fourteenth

Amendment gives state pretrial detainees . . . rights that are *at least as great* as the Eighth

Amendment protections available to a convicted prisoner." Walton v. Dawson, 752 F.3d 1109,

1117 (8th Cir. 2014).  The Eighth Circuit therefore applies the Eighth Amendment's deliberate

indifference standard to conditions of confinement claims brought by pretrial detainees. Id.; see

also Bailey v. Feltman, No. 14-3859, 2016 WL 191929 (8th Cir. Jan. 15, 2016)(cases involving

denial of medical care claims brought by pretrial detainees have "borrow[ed] from the Eighth

Amendment deliberate-indifference standard applicable to claims of prison inmates.");  Butler

v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006).

### (A).  Claims against Aramark

Plaintiff testified that in the year 2010, he was diagnosed with Type II diabetes[3] and with

an allergy to gluten by Dr. William Piechal at the Healing Arts Medical Center.[4]  When he was

booked in, Plaintiff notified jail personnel that he was diabetic and needed a gluten free diet.  He

submitted his first written request on October 18, 2013, the day after he was booked in, asking

---

[3] In his deposition, Plaintiff testified he was diagnosed with Type II diabetes in 2008.  Doc. 73-15 at 24.

[4] A subpoena was issued for Plaintiff's records from this facility.  The records do not corroborate a diagnosis for either condition.

-4-

to be put on a diabetic and gluten free diet. Doc. 73-6 at 3.[5]  In response, Nurse Vickery stated

he was on a diabetic diet. *Id.*  Her response did not mention his gluten allergy. *Id.*

Plaintiff testified that despite Nurse Vickery's response, he continued to receive a normal

tray for two weeks to a month.  He testified that breakfast frequently consisted of biscuits and

gravy, oatmeal, cream of wheat, or malt-o-meal, and that lunch and dinner frequently consisted

of hot dogs and beans, breaded chicken, or chicken fried steak.

Plaintiff testified that when he verbally complained to the nurse and floor deputies, he

was told they had no control over the food Aramark served.  Plaintiff testified that during this

time period, he ate only the foods on the tray that were within his diet restrictions.  He indicated

he either gave the other food away or traded it.  Plaintiff testified he was quickly losing weight.

Specifically, Plaintiff testified that he weighed around 280 pounds when he was booked in and

was down to 190 pounds.

In a request dated November 28, 2013, Plaintiff stated he had lost 11 pounds in just the

last few days.  Doc. 73-6 at 9.  He asked that the medical department review his diet with the

food service.  *Id.*  Plaintiff asserted that he was getting a diabetic diet but not a gluten free diet,

which resulted in his having to throw away the items containing gluten.  *Id.* at 10.  On December

8, 2013, Plaintiff stated that he received gluten free meals that day but not a diabetic diet.  *Id.* at

13.

---

[5]For ease in locating the proper page in summary judgment exhibits filed with the Court, the Court
will refer to the CM/ECF document number and page whenever possible.

Various documents in Plaintiff's jail file contain his weight.  On March 31, 2013, Plaintiff's weight was listed as 263 pounds.[6]  Doc. 73-4 at 2.  On April 21, 2013, Plaintiff's weight was listed as 250 pounds.  Doc. 73-5 at 8.  On June 4, 2013, Plaintiff's weight was listed as 263 pounds.  Doc. 73-5 at 3 & 11.  On October 2, 2013, his weight was listed as 235 pounds.  Doc. 73-4 at 33.  The October 17, 2013 booking sheet, which pertains to the begrining of the period of incarceration at issue, indicates Plaintiff weighed 228 pounds when booked.  Doc. 73-5 at 22.

Jail personnel noted that Plaintiff's weight was 228 pounds on April 21, 2014, but by May 9, 2014, his weight had dropped to 205 pounds.[7]  Doc. 134 at 2.  During this period of time, Plaintiff's weight was recorded seven times.  *Id.*  Plaintiff indicated he was being brought down to booking on Wednesday, Friday, and Sunday each week to have his weight taken and recorded.  Doc. 73-8 at 3.

At intake on November 14, 2014, Plaintiff weighed 208 pounds which reflects a three pound weight gain during the time, June to November, Plaintiff was not incarcerated.  Doc. 134 at 2.  His weight was taken on November 19, 2014, and was 204 pounds.[8]  *Id.*

---

[6]Several of the days on which his weight is listed predate the incarcerations at issue in this case.  However, the Court believes this is relevant to Plaintiff's assertion that he weighed 280 pounds when booked into the WCDC on October 17, 2013.

[7]The affidavit of Janet Stephens, Vice President of Quality Assurance for Southern Health Partners, Inc., the contract carrier for medical care at the WCDC, between November 1, 2014, and December 31, 2015, provides a summary of Plaintiff's weight as documented in his records.  Doc. 134.  The figures provided do not seem to be consistent.  For instance, on April 21, 2014, Plaintiff's weight was recorded as 228 pounds while two days later it was recorded as 210 pounds--a loss of eighteen pounds in two days.  His weight was again recorded as 228 pounds on May 22, 2014.  The Court will view the affidavit in the light most favorable to the Plaintiff and assume the weights reflecting the greatest amount of weight loss to be accurate.

[8]The Court will not consider weights listed for the year 2015.  These weights are after the relevant time periods and do not shed any light on the Plaintiff's, weight or weight loss, during the relevant periods of incarceration.

AO72A
(Rev. 8/82)

Plaintiff testified that by the end of October 2013 or the first part of November 2013, he was receiving a diabetic diet but not a gluten free diet. He testified that there was a minimal amount of food on the tray that he could eat with his gluten allergy. He asserts that the trays frequently contained wheat bread. He testified he ate the potatoes, rice and fruit. On approximately seven occasions, Plaintiff received no tray at all. Plaintiff testified this typically happened when he sent the tray back because it was wrong and he just never received a replacement tray.

Plaintiff testified he ordered items from the commissary when he had the funds. A portion of what he ordered was ordered so that he could trade the items with other inmates. Plaintiff testified, for example, that he would purchase jolly ranchers and peanut butter crackers, Doc. 73-11 at 1, to trade for milk, rice, potatoes, vegetables, or extra cereal in the morning. It just depended on what was available. When he received care packages, he said he traded those for other items.

From November 24, 2013, to November 27, 2013, Plaintiff fasted for religious reasons. When he fasted, Plaintiff testified he would eat plain white rice and chicken or beef broth. Doc. 73-6 at 14. However, he testified he did not have these food items available to him at the WCDC.

Once his fast was complete, he again complained to food services that although he was receiving a 2000 calorie diabetic diet, it was not gluten free. Doc. 73-6 at 10. Plaintiff testified that as a result, he was forced to throw away food items containing gluten. *Id.* In response, Sonia Jennings, an Aramark employee, responded that she would look at his dietary needs. *Id.*

-7-

On November 28, 2013, Plaintiff submitted a grievance stating that he had been served both bread and cookies that he was not supposed to have. Doc. 73-6 at 10. The response from command staff was to eat what he could and throw the rest away. *Id.* On November 29, 2013, Plaintiff again complained that he could not eat half of his meal. *Id.*

Plaintiff testified that at the end of November, he was finally given a gluten free diet. Nevertheless, via grievances, Plaintiff continued to complain over the course of many months of errors in his trays. *See e.g.,* Doc. 73-6 at 3 (10/18/2013), 9 (11/28/2013), 10-14 (11/27/2013-12/13/2013), 15-16 (12/25/2013-12/27/2013), 18 (12/28/2013), 24 (1/18/2014), 25-26 (1/18/2014), 35 (1/30/2014), 39 (2/3/2014); Doc. 73-7 at 4 (2/20/2014), 7-8 (2/22/2014-2/28/2014), 11-18 (2/20/2014-3/18/2014), 23-25 (3/28/24-4/1/2014), 29 (4/4/2014), 31-33 (4/8/2014-4/10/2014), 35 (4/16/2014); Doc. 73-8 at 34 (5/25/2014), 38-39 (5/31/2014); 73-12 at 4 (12/25/2013).

Plaintiff testified that he continually received at least one tray a day that contained food items not within his dietary restrictions. Plaintiff testified he was able to minimally supplement his diet with commissary items and by trading food. Plaintiff also maintained that he was receiving insufficient caloric content.

Plaintiff noted that the jail policy states that sedentary inmates should receive a minimum of 2300 calories a day, while active inmates should receive a minimum of 2800 calories. Doc. 110-18 at 1. Plaintiff notes that Aramark's nutrient summary for the diabetic diet indicates the diet is 2200 calories, of which 350 calories are an after dinner snack. Doc. 110-22 at 6. Plaintiff testified he was not getting the 350 calorie snack. Furthermore, Plaintiff was told by Nurse Meschede that he was on a 2000 calorie diabetic gluten- free diet. Doc. 73-7 at 15.

-8-

Plaintiff also testified he was served the same foods over and over again. He believes the food served lacked nutritional value. Plaintiff complained that the Defendants were more concerned with recording that he was served a meal than they were with serving him a proper diet. Doc. 73-6 at 15.

According to Jennifer Laub, a multi-service director for Aramark, whose duties include management of inmate meals at the WCDC, medical personnel directed that Plaintiff receive a 2,000 calorie per day diabetic diet. Doc. 114 at 2, ¶ 6. Laub further indicates that Plaintiff's meals were prepared using the gluten restricted diet menu pattern which provides for a 2,000 calorie daily diet without including an evening snack. *Id.* at ¶¶ 6-8. Plaintiff has submitted, for review by the Court, three copies of the gluten restricted diet menu pattern. Doc. 115 at 20-23. On each, it appears he has circled the food items he was served. *Id.* On the first page, he has calculated the calories and the amount of protein, carbohydrate, fat, sodium, fiber, and sugar for each meal. *Id.* at 20.

Plaintiff testified that on one occasion when he was in isolation, he was provided a tray with "pea size" tortilla chips and beans with no utensils. Deputy Shepherd did not replace the tray.

Several video clips have been provided to the Court. Exhibit 1 to Supplemental Affidavit 117. Five of the clips were taken on March 7, 2014. Doc. 117 at 1-3. The clips show Plaintiff in what is referred to as B-pod padded or the observation cell. *Id.* at 1. At the request of the Court, Defendants have provided an affidavit of Corporal Tom Mulvaney describing for the Court the contents of the video clips. Doc. 117. Plaintiff objects to Defendants being asked to describe the video footage. His objection is groundless. The Defendants have provided the

-9-

Court with the date and times covered by each clip as well as describing the location in the detention center.  This information was necessary so the Court, when viewing the footage, had the proper context.  There are many hours of video provided to the Court.

The video from March 7, 2014, shows the Plaintiff being offered food on two occasions.  On the first occasion, Plaintiff looks at the food but does not eat any of it.  There is no audio.  On the second occasion, Plaintiff eats a small amount of the food.

There are five video clips from March 8, 2014.  Plaintiff was offered food on two occasions.  On the first occasion, he does not eat any of the food and instead throws it around the cell.  On the second occasion, the first food tray was refused, a replacement was offered and refused, and a third tray was given to Plaintiff.  Plaintiff ate a small amount of food.

Plaintiff testified he had foreign objects in his food on two separate occasions.  On February 11, 2014, Plaintiff found a piece of wood in his beans.  Doc. 73-6 at 39.   Plaintiff described the piece of wood as being approximately the size of the end of his pinky finger.  Plaintiff did not put the wood in his mouth and did not become ill because it was present in his food.  Plaintiff testified he had eaten most of his meal before he discovered the piece of wood.  Plaintiff showed Deputy Standrod the piece of wood and gave it to him.  Plaintiff did not report the incident to Aramark.

On February 16, 2014, Plaintiff reported that he received a smashed boiled egg with shell imbedded in the eggs.  Doc. 73-7 at 3.  Sergeant Fuller responded that the meal trays were stacked one upon another and passed out so that there was no way it could be determined in advance which tray would be served to the Plaintiff.  *Id.*  Plaintiff testified he did not believe the

-10-

tray left the kitchen in that condition.  *Id.*  These were the only times Plaintiff was aware of his food being "contaminated."  Doc. 73-15 at 18.

On February 20, 2014, Plaintiff received an incorrect tray.   Doc. 110-20 at 1.  Deputy Graham called and ordered a correct tray.  *Id.*  However, it was not received by the end of shift. *Id.*  Deputy Graham went to the kitchen to locate the tray but found that Aramark employees had left.  *Id.*  Deputy Graham took the Plaintiff a sack lunch but the Plaintiff stated he could not eat it.  *Id.*

### (1).  Adequacy of the Diet

The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health.  See e.g., Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996); Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992)(prisoners have a right to nutritionally adequate food); Campbell v. Cauthron, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet).  Merely because the food served is not prepared to an inmate's taste does not implicate the Eighth Amendment. Burgin v. Nix, 899 F.2d 733, 734-35 (8th Cir. 1990).  Rather, the Eighth Amendment is only violated if the food provided is inadequate to maintain good health. *Id.*; see also Wilson v. Seiter, 501 U.S. 294, 298 (1991)(the deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the minimal civilized measure of life's necessities).

Aramark presents the argument that it did not act under color of state law.  As recognized by Aramark, this Court has, on a number of occasions, determined that Aramark, working pursuant to a contract, acts under color of state law in providing meals to prisoners.  See e.g., Wilmoth v. Aramark Correctional Services, LLC, 2012 WL 4472147 (W.D. Ark. Aug. 16, 2012);

-11-

Setzer v. Aramark Correctional Services, 2011WL 7071078 (W.D. Ark. Nov. 22, 2011); Jones

v. Helder, 2011 WL 1193733 (W.D. Ark. March 29, 2011).

In Wilmoth this Court stated:

> In West v. Atkins, 487 U.S. 42, 57 (1988), the Supreme Court concluded that a
> physician under contract to provide medical services to inmates at a state prison
> was a state actor because his function could fairly be held attributable to the state.
> The same reasoning applies here. Benton County has a constitutional obligation
> to provide nutritionally adequate meals to the inmates of the BCDC. Benton
> County has delegated this obligation to ARAMARK and ARAMARK
> contractually assumed this obligation.

2012 WL 4472147, *5; see also Pagan v. Westchester County, 2014 WL 982876 (S.D.N.Y.

March 12, 2014)(Aramark has contracted to perform the governmental function of providing

nutritionally adequate food to prisoners in Westchester County); Williams v. Gloria, 2013 WL

3982348 (E.D. Pa. Aug. 2, 2013)("Aramark was acting under color of state law in the preparation

of food for inmates"); Jubeh v. Dart, 2011 WL 6010267 (N.D. Ill. Nov. 29, 2011)(Aramark acted

under color of state law); Drennon v. ABL, 2006 WL 3448686 (M.D. Tenn. Nov. 27,

2006)(finding a food service contractor at a correctional facility to be acting under color of law).

The same reasoning applies to this case.

A "corporation acting under color of state law will only be held liable under § 1983 for

its own unconstitutional policies." Crumpley-Patterson v. Trinity Lutheran Hosp., 388 F.3d 588,

590 (8th Cir. 2004)(citation omitted); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694

(1978).  Aramark can be held liable in this case only if "there was a policy, custom, or official

action that inflicted an actionable injury."  Johnson v. Hamilton, 452 F.3d 967, 973 (8th Cir.

2006).

AO72A
(Rev. 8/82)

In this case, Plaintiff essentially argues that Aramark has a custom of violating its own policy and guidelines with respect to the provision of special diets and of ignoring constitutional violations with regard to special diets. A custom is a "persistent, widespread pattern of unconstitutional conduct of which officials have notice and subsequently react with deliberate indifference or tacit authorization." Johnson v. Outboard Marine Corp., 172 F.3d 531, 536 (8th Cir. 1999).

Here, Plaintiff contends the food actually served did not comply with the written menus or with his recognized dietary restrictions. Plaintiff provided written notice of this via his numerous requests and/or grievances. *See e.g.,* Doc. 73-6 at 3 (10/18/2013), 9 (11/28/2013), 10-14 (11/27/2013-12/13/2013), 15-16 (12/25/2013-12/27/2013), 18 (12/28/2013), 24 (1/18/2014), 25-26 (1/18/2014), 35 (1/30/2014), 39 (2/3/2014); Doc. 73-7 at 4 (2/20/2014), 7-8 (2/22/2014-2/28/2014), 11-18 (2/20/2014-3/18/2014), 23-25 (3/28/24-4/1/2014), 29 (4/4/2014), 31-33 (4/8/2014-4/10/2014), 35 (4/16/2014); Doc. 73-8 at 34 (5/25/2014), 38-39 (5/31/2014); 73-12 at 4 (12/25/2013). The record indicates detention center staff also noted that there were numerous problems with the food on the Plaintiff's tray and that they had to contact the kitchen. *See e.g.,* Doc. 73-10 at 3-5 (1/18/2014-2/21/2014), 9 (2/23/2-14), 12 (3/7/2014).

Aramark now argues that there is no medical evidence establishing Plaintiff's need for a gluten free diet.[9] Aramark is correct that the medical records submitted in connection with this summary judgment motion do not appear to contain any medical evidence establishing Plaintiff's need for a gluten free diet. However, Plaintiff testified he had been diagnosed with a gluten

---

[9] Aramark filed a motion (Doc. 54) asking for a physical examination of the Plaintiff. The motion was denied (Doc. 81). However, Aramark was advised that it could renew the motion if their summary judgment motion was denied.

-13-

allergy.  Construing the record in Plaintiff's favor as we must, the Court accepts as true that Plaintiff is a diabetic and has a gluten allergy.  I note that there is "no diagnostic test for wheat sensitivity, other than eliminating wheat and gluten from the diet and reintroducing them to see if symptoms recur. Celiac disease can be diagnosed with blood tests and a biopsy of the small intestine." http://newsnetwork.mayoclinic.org/discussion/no-test-to-diagnose-wheat-or-gluten-sensitivity/?_ga=1.205459856.1214992893.1446663999 (accessed January 31, 2016).

Further, Aramark did not refuse to provide Plaintiff with a diabetic gluten free diet because of the lack of medical evidence supporting the need for it.  Instead, Aramark maintains that it did in fact provide the Plaintiff with a diabetic gluten restricted diet when directed to do so by medical staff.

Aramark also argues that Plaintiff suffered no actual, physical injury.  On this point, I agree. While the record supports the fact that Plaintiff did lose weight, approximately 23 pounds down to a weight of 205 pounds,[10] Plaintiff conceded in his deposition that he still weighed more than was recommended for his height; Plaintiff testified his recommended weight was 180 to 200 pounds.  Doc. 73-14 at 13.  Additionally, some weight loss may be attributable to the periods during which Plaintiff fasted--two periods consisting of seven days without any food.  *Id.* at 9.

Other than the loss of weight, Plaintiff did not become ill as a result of the food he was served or suffer any adverse physical effects.  He received three meals a day and he testified that at times he also received an evening snack.  *See also* Doc. 73-14 at 7 & 16.  While he received

---

[10]Plaintiff's medical records indicate he did at one time weigh nearly 300 pounds.  Doc. 139 at 3.  As noted above, he weighed 228 pounds when he was booked in on October 17, 2013, the beginning of the period of time at issue in this case.  Doc. 73-5 at 22.

-14-

a fixed calorie diet, the 2000 calorie diabetic and gluten restricted diet was ordered by medical staff not by Aramark.  Doc. 73-1 at 1.

Furthermore, Plaintiff concedes that the United States Department of Agriculture (USDA) recommends a diet of between 2000 and 2400 calories.  Doc. 70-1 at 2.  Plaintiff concedes he was overweight according to the standard set by the USDA when he entered the detention center.  *Id.*  Plaintiff characterized it as being put on a "forced diet to comply with standards set forth by the government."  *Id.*

Plaintiff testified there were six or seven times he did not receive a corrected tray.  Doc. 70-1 at 8-9.  A few of these times were when Plaintiff made only a verbal complaint to the guard and did not utilize the kiosk system.  *Id.* at 9-10.

While he did not receive as many calories a day as he was apparently used to eating prior to his incarceration, other than the loss of weight, there is no evidence that he suffered other adverse effects to his health or was denied a nutritionally and calorically adequate diet.  Construing all facts in Plaintiff's favor as we must, I find there is no genuine issue of material fact as to whether the diet served to Plaintiff denied him the minimal civilized measure of life's necessities.  See Wilson, 501 U.S. at 298.

Aramark is entitled to summary judgment on this claim.

### (2).  Foreign Objects in the Diet

"Constitutional standards require only that prison authorities provide an inmate with well-balanced meals, containing sufficient nutritional value to preserve health."  Berry v. Brady, 192 F.3d 504, 507 (5th Cir. 1999) (internal quotation marks and citation omitted).  An isolated incident involving a foreign object in the food does not state a claim of constitutional dimension.

-15-

See e.g., Wishon, 978 F.3d at 449 ("[P]risoners have a right to nutritionally adequate food; however, Wishon has presented no evidence that the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food"); Hamm v. DeKalb County, 774 F.2d 1567, 1572 (11th Cir. 1985) ("The fact that the food occasionally contains foreign objects . . . does not amount to a constitutional deprivation"); Lunsford v. Reynolds, 376 F. Supp. 526, 527 (W.D. Va. 1974) ("The only contention concerning food which is detailed at all, is the inmates' complaint that their food frequently contains insects.  Nevertheless, occasional incidents of a foreign object contained in food, while regrettable, does not present a question of constitutional proportion").

Out of the numerous meals Plaintiff was provided, he only points to two occasions on which there were foreign objects in his food**.**  This is simply insufficient to state a claim of Constitutional dimension.  Aramark is entitled to summary judgment on this claim.

### (B).  Claims Against the WCDC

### (1).  Religious Freedom

Plaintiff testified, with respect to his religious rights claim, that he is a Christian and has belonged to the Methodist Church since he turned eighteen.  Prior to that, Plaintiff was a Catholic.  Plaintiff further testified that there were six holidays throughout the year during which he voluntarily fasted for up to three days.  During  a fast, he typically lost two or three pounds but quickly regained the weight.

Plaintiff testified he fasted for religious reasons from November 24, 2013, until November 28, 2013.  Plaintiff testified that he did not believe that the Bible called for the fast but he had a personal Christian belief that he had to fast for these three days.  In his deposition,

-16-

Plaintiff testified that fasting was a private matter between you and God as taught in Matthews 6. Doc. 73-15 at 1.

Plaintiff testified that on November 25, 2015, he was taken out into the hallway by four or five deputies including Corporal Foster, Deputy Weissbrock, Deputy Workman, and Deputy McNalley. *See also* Doc. 73-14 at 4. Nurse Bradley was also present. *Id.* Sergeant Morse was the shift commander. *Id.* at 31-33. Plaintiff stated he was told that if he did not eat, he would be put in isolation without any clothes. *See also* Doc. 73-14 at 5.

Plaintiff testified the isolation cell had no bathroom, the lights were on twenty-four hours a day, and it was cold. Plaintiff found this to be intimidating; however, he continued his fast and was not placed in isolation. Plaintiff did not recall Nurse Bradley or any of the Defendants specifically saying they were concerned for his health.

Plaintiff recognized that since he was diabetic there were health concerns in connection with fasting. For short fasts, Plaintiff testified he reduced his activity level, ate oranges, and drank either vitamin water or a Gatorade type drink. Plaintiff testified that while he was at the detention center, it "was basically a fast with just water." Doc. 73-14 at 9. Plaintiff testified these precautions were sufficient for a short fast for a diabetic. Plaintiff testified he knew his body and was able to tell when his sugar was low. He suffered no ill effects from the fasting.

On November 26, 2013, Plaintiff was taken into the hallway again and was told he had to start taking his meals. Plaintiff testified he began accepting his meal trays and just gave them away. He continued to fast.

Plaintiff testified he fasted again from December 23, 2013, to December 25, 2013. Plaintiff informed the jail chaplain that he intended to fast. Plaintiff testified he was again

threatened in the hallway with being moved to isolation.  Plaintiff was not put in isolation and, again he began accepting his trays and gave or threw them away.

Plaintiff testified that he could not recall with any certainty which Defendants were present during each incident.  He believed Deputies McNeeley, Weissrock, and shift commander Whitting were present during the December incident.  While Plaintiff testified he told the shift commander about the incident, Plaintiff could not recall him being personally present.

In Love v. Reed, 216 F.3d 682 (8th Cir. 2000), the Eighth Circuit dealt with the issue of whether or not the Arkansas Department of Correction should be required to provide an inmate with food, peanut butter and bread, he could prepare himself on the Sabbath.  The Plaintiff  in that case had concluded, based on his study of the Old Testament, that it was wrong to leave his cell or to work on the Sabbath.  Id. at 686.  He also believed that he could not benefit from work performed by others on the Sabbath.  Id.  He therefore could not eat food prepared or served by others.  Id.

The ADC first argued that Love's belief systems should not be considered a religion.  The Court stated:

> First Amendment protection only attaches to beliefs rooted in religion, as opposed to purely secular beliefs or personal preferences.  "The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task . . . .  However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question, religious beliefs need not be acceptable, logical, consistent or comprehensible to others in order to merit First Amendment protection."

Id. at 687 (quoting Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 707, 714 (1981))(internal citations omitted).

-18-

In analyzing whether Love's belief system constituted a religious belief, the Eighth Circuit relied on the following three "useful indicia" set forth by the Third Circuit in <u>Africa v. Commonwealth of Pennsylvania</u>, 662 F.2d 1025, 1032 (3d Cir. 1981):

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters.  Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching.  Third, a religion often can be recognized by the presence of certain formal and external signs.

*Id.*

In this case, Plaintiff testified he is a Christian and currently a member of a Methodist Church.  However, with respect to his fasting, he testified it is not based on any teaching of the Bible or other religious text.  The fasting was not part of the teaching of the Methodist faith.  Rather, it is the Plaintiff's own personal belief or practice.  Applying the three factors set forth in <u>Africa</u>, I conclude there is no genuine issue of material fact as to whether Plaintiff's practice of fasting constitutes a religious belief within the meaning of the First Amendment.  Furthermore, as discussed above, Plaintiff was not put in isolation and he was allowed to fast.  Plaintiff testified that Defendants were satisfied when he accepted his food trays.  He was not required to eat the food.  What he did to the food was up to him.

The Defendants also contend they are entitled to qualified immunity.  "Government officials are entitled to qualified immunity for discretionary decisions unless they violate a clearly established constitutional right."  <u>Jones v. Minnesota Dept. of Corrections</u>, 512 F.3d 478, 484 (8th Cir. 2008)(citation omitted).  Having concluded the Plaintiff failed to demonstrate the existence of a constitutional violation, Defendants are entitled to qualified immunity.  <u>Grayson v. Ross</u>, 454 F.3d 802, 808 (8th Cir. 2006)("If the answer [to whether a constitutional rights was violated] is no, we grant qualified immunity").

-19-

AO72A (Rev. 8/82)

The Washington County Defendants are entitled to summary judgment on this claim.

**(2).  Conditions of Confinement**

With respect to his conditions of confinement, Plaintiff maintains the detention center was overcrowded and that he should have been given a second mat.  Plaintiff testified that in January of 2014, he was confined in a fourteen man cell with seventeen other inmates.  Plaintiff slept on the floor for ten to twelve days.  Plaintiff did have a mattress but testified he should have been provided with two mattresses for medical reasons.  Plaintiff did not know who was responsible for assigning the inmates to the cells.

On January 21, 2014, Plaintiff complained that they had added another inmate to the cell. Doc. 73-6 at 27.  Plaintiff complained that the cells were lock-out cells, which kept him from being able lay down to alleviate his medical conditions.  *Id.*  Plaintiff also complained that the overcrowding was affecting his mental stability.  *Id.*  On January 22, 2014, Plaintiff complained that there were now 20 people in the cell block.  *Id.* at 28.  Plaintiff stated that he did not feel safe in the "pressure cooker environment."  In response, Plaintiff was told that all blocks were full at that time.  *Id.* at 29.

Plaintiff testified that as a result of his conditions of confinement, he ended up having a seizure on January 23, 2014.  Doc. 73-6 at 30.  He believes the seizure was caused by his sleeping on the floor and being in a crowded environment.  He was seen by Nurse Bradley.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit

-20-

AO72A
(Rev. 8/82)

inhumane ones.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  "[I]nmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time."  Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989).

The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981); see also Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006) (deliberate indifference standard of the Eighth Amendment applies to all claims that prison officials failed to provide adequate food, clothing, shelter, etc., whether brought by pretrial detainees or convicted inmates). Prison conditions claims include threats to an inmate's health and safety.  Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element."  Revels v. Vincenz, 382 F.3d 870, 875 (8th Cir. 2004)(citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities.  The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" Id.  (citations and internal quotation marks omitted).  Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety."  Revels, 382 F.3d at 875.

Having an inmate sleep on the floor is not necessarily unconstitutional, <u>see e.g., Ferguson v. Cape Girardeau County</u>, 88 F.3d 647, 650 (8th Cir. 1996) (use of a floor mattress for thirteen nights not unconstitutional); rather, consideration must be given to the totality of the circumstances, including the length of time the inmate is forced to sleep on the floor and the health of the inmate . <u>See e.g., A.J. by L.B. v. Kierst</u>, 56 F.3d 849, 855 (8th Cir. 1995)(sleeping on mattresses on the floor not unconstitutional when it was for only a relatively short period of time and then only when there was a special need); <u>see also Hubbard v. Taylor</u>, 538 F.3d 229 (3d Cir. 2008)(having to sleep on the floor for three to seven months was not excessive).

Here, Plaintiff testified he slept on the floor for only ten to twelve days.  He always had a mattress but there were times he did not have a medically approved second mattress.  This is simply insufficient to state a claim of constitutional dimension.

"[O]vercrowding alone is insufficient to create a due process violation." <u>A.J. by L.B. v. Kierst</u>, 56 F.3d 849, 854 (8th Cir. 1995).  Here, Plaintiff has not shown that the "overcrowding led to deprivations of essential food, medical care, or sanitation." <u>Patchette v. Nix</u>, 952 F.2d 158, 162 (8th Cir. 1991)(<u>citing Cody v. Hillard</u>, 830 F.2d 912, 914 (8th Cir. 1987)).

Plaintiff stated he always had a mattress or bunk to sleep on.  He had access to a day-room, was able to shower and keep his body clean, and his basic human needs for food, clothing, and shelter were met.  A *de minimis* level of imposition does not rise to the level of a constitutional violation. <u>Bell v. Wolfish</u>, 441 U.S. 520, 539 n. 21 (1979); <u>see also Wilson v. Seiter</u>, 501 U.S. 294, 305-05 (1991)("Nothing so amorphous as 'overall conditions' can rise to

-22-

the level of cruel and unusual punishment when no specific deprivation of a single human need exists.").  There is simply no evidence that the Plaintiff was deprived of a single human need.

The Defendants also contend they are entitled to qualified immunity.  Having concluded the Plaintiff failed to demonstrate the existence of a constitutional violation, Defendants are entitled to qualified immunity.  See Grayson, 454 F.3d at 808.

The Washington County Defendants are entitled to summary judgment on this claim.

### (3).  Medical Care

On November 12, 2013, Plaintiff requested a second blanket because of poor circulation in his extremities as a result of diabetes.  Doc. 73-12 at 3.  His request was refused by Nurse Bradley on the grounds that there was no medical reason for it.  *Id.*  However, on January 3, 2014, Nurse Meschede authorized the Plaintiff to have a "24 HR 2ND BLANKET."  Doc. 73-12 at 5.  According to Plaintiff, Nurse Bradley was in charge of medical diets and also refused to provide him proper and adequate care.  Doc. 73-14 at 34.

Following his seizure on January 23, 2014, Plaintiff complained of burning and weakness in his right shoulder down to his elbow.  Doc. 73-6 at 30.  Plaintiff wanted to know if there was an explanation for this, such as someone restraining him by kneeling on his shoulder.[11]  *Id.*  Plaintiff testified he also felt light-headed, disorientated, and had a metallic taste in his mouth.  Plaintiff did not believe he was treated at the time of the seizure.  The medical chart does not indicate he was seen at that time or that any treatment was given.  Doc. 73-12 at 5.  The Court

---

[11]In his deposition, Plaintiff testified that during one of his seizure episodes, Nurse Bradley was kneeling on his shoulder.  Doc. 73-14 at 41.

AO72A
(Rev. 8/82)

has not been provided with the affidavits of the medical personnel who saw or treated the Plaintiff.

Nurse Bradley did respond on January 24, 2014, to Plaintiff's question about being restrained. She stated: "Sir, you were not restrained the deputy was guarding your hands to keep you from hitting someone." Doc. 73-6 at 30.

The medical log or chart contains no entries between January 3, 2014, and March 15, 2014. Doc. 73-12 at 5. Between January 2014 and March 2014, Plaintiff complained of suffering from ice pick headaches, pain in his right side, back, and in his right shoulder. See e.g., Doc. 73-7 at 19. He also had another seizure episode in February and he asserts jail staff merely stood around for two hours while he had a catatonic type seizure. Doc. 73-7 at 5. On March 16, 2014, Plaintiff requested medical attention due to headaches, his right shoulder, and sores on his backside. Doc. 73-7 at 19. On March 16, 2014, Plaintiff was prescribed Ibuprofen, 200 mg. three times daily, for thirty days, for complaints of right shoulder pain. Doc. 73-12 at 5-6.

According to Plaintiff, a hernia first manifested itself in February or March of 2014. Doc. 73-14 at 42. Plaintiff testified that it was a protruding bowel hernia that he was required to reduce himself, sometimes multiple times a day. Doc. 73-8 at 30-38. Plaintiff was sent for a surgical consult and the surgeon recommended surgical repair; however, because it was not regarded as an emergent condition, he was not scheduled for surgery. Doc. 73-8 at 30-38.

Plaintiff was seen by the doctor regarding his shoulder on March 18, 2014. Doc. 110-16 at 1. The doctor's chart notations from this visit are illegible. *Id.* Plaintiff testified that he was prescribed oral medication, given a shot, and x-rays were ordered. *See also id.*; Doc. 73-12 at

AO72A
(Rev. 8/82)

5-6 & 12.  The x-ray was taken on March 20, 2014.  Doc. 73-12 at 17.   The x-ray showed no evidence of fracture or dislocation of the shoulder but there was mild degenerate change of the acromioclavicular (AC) joint.  *Id.* at 20.  Because a nodule was noted projecting over the right upper lobe, a CT scan was recommended and performed.  *Id.* at 20-21.  The nodule was determined to be partially calcified and benign.  *Id.* at 21.

It appears the Plaintiff was seen by a doctor on April 8, 2014.  Doc. 73-12 at 14.  However, the doctor's notes are illegible.  *Id.*

On March 26, 2014, Plaintiff was seen complaining of pressure sores on his buttocks.  Doc. 73-12 at 7.  The doctor authorized a towel for the Plaintiff to sit on when in the day-room.  *Id.*  On April 16, 2015, Plaintiff was authorized a second mat and blanket.  *Id.* at 8.  He was also given Ibuprofen three times daily for thirty days.  *Id.* at 9.

On April 21, 2014, an order was entered for the Plaintiff's weight to be taken on Sunday, Wednesdays, and Fridays until May 21, 2014.  Doc. 73-12 at 10.  That same day, Plaintiff submitted a medical request asking if there had been any progress on arriving at a diagnosis for his right shoulder and upper arm.  *Id.* at 10.  In response to his request about his shoulder, a new order for a surgical consult was written.  *Id.*

On April 22, 2014, Plaintiff was seen by the doctor and diagnosed with a left inguinal hernia.  Doc. 73-12 at 13.  It was noted to be very tender and a surgical consult was ordered.  *id.*  The doctor noted that the Plaintiff should stay down until he was seen.  *Id.*  A notation was made that the x-ray of the right shoulder had been negative.  *Id.* Although Plaintiff's original medical

request concerned his right shoulder, it does not appear the doctor discussed this with the Plaintiff. *Id.* at 13 & 19.

On May 6, 2014, Plaintiff was seen at Washington Regional Medical Center. Doc. 110-17 at 3. It was noted that Plaintiff had a left inguinal hernia that could be repaired at a later date. *Id.* A note was made that he did not need bed rest. *Id.*

On May 10, 2014, Plaintiff complained about his inguinal hernia and being told to "keep pushing it back thru." Doc. 110-17 at 2. He also noted that the consulting doctor determined that he needed surgery. *Id.*

On May 13, 2014, Plaintiff was seen concerning his right shoulder. Doc. 110-17 at 1. The notes indicate Plaintiff had been seen by a surgeon and was told that surgery was not an emergency and there was no need for bed rest. *Id.*

On May 22, 2014, Plaintiff was taken to Ozark Surgical for a consult regarding his hernia. Doc. 110-17 at 5. It was noted that the Plaintiff had to be able to reduce the hernia when needed. *Id.* Further, surgery was still considered elective unless the hernia became "strangulated/incarcerated. *Id.* This apparently happened because on October 10, 2014, Plaintiff was diagnosed with an incarcerated left inguinal hernia and surgery was performed four months after Plaintiff's release and before his reincarceration. Doc. 110-17 at 8.

After he was released from the WCDC in June 2014, Plaintiff was diagnosed with, and treated for, bursitis. Plaintiff testified he underwent physical therapy and was prescribed pain medication and an anti-inflammatory. Plaintiff testified that the free clinic could not provide treatment for seizures or for mental issues.

-26-

Plaintiff testified that after he was re-incarcerated in the WCDC, that the detention center had new medical staff.  He indicates he was scheduled for a CT scan and put on a low dose aspirin regimen.

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard.  See Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006).  To prevail on an Eighth Amendment claim, the Plaintiff must prove that defendants acted with deliberate indifference to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  The deliberate indifference standard includes "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting  Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even that gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct."  Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

The "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." Jenkins v. County of Hennepin, Minn., 557 F.3d 628, 633 (8th Cir. 2009).  The objective seriousness of delay in treatment must be measured by reference to the

-27-

effect of delay, which must be shown by verifying medical evidence in the record.  <u>Laughlin v. Schriro</u>, 430 F.3d 927, 929 (8th Cir. 2005).  In evaluating a treatment delay for summary judgment purposes, the court "must accept facts as recited in prisoner affidavits as true." <u>Wise v. Lappin</u>, 674 F.3d 939, 941 (8th Cir. 2012) (citing <u>Tlamka v. Serrell</u>, 244 F.3d 628, 634 (8th Cir. 2001)).

Nurse Bradley is the only named medical defendant.  Of all the medical issues and/or encounters outlined above, Nurse Bradley's involvement with the Plaintiff was as  follows: on November 13, 2013, she denied Plaintiff's request for a second blanket--Doc. 73-12 at 3; a medical call on November 25, 2013, when Plaintiff refused to see her--*Id.*; on March 18, 2014, she specified that his 2000 calorie diabetic diet should also be gluten free--*Id.* at 6; on March 18, 2014, she recorded prescriptions ordered by the doctor--*Id.*; on March 20, 2014, she completed a medical transport sheet so that Plaintiff could be taken to Physicians Speciality Hospital--*Id.* at 7; on March 26, 2014, she recorded that the doctor authorized the Plaintiff to have a towel to sit on in the day room due to pressure sores--*Id.*; on April 1, 2014, she added the Plaintiff to the doctor call list due to pressure sores--*Id.* at 8; on April 8, 2014, she logged a visit to the doctor--*Id.*; on April 17, 2014, she authorized the Plaintiff to have a 24 hour second mattress--*Id.* at 9; on April 21, she added Plaintiff to the doctor call list--*Id.* at 10; on April 22, 2014, she logged a new order by the doctor for a surgical consult--*Id.*.

Construing the facts in the light most favorable to the Plaintiff, there are no genuine issues of material fact as to whether Nurse Bradley was deliberately indifferent to the Plaintiff's serious medical needs.  It is true that Plaintiff requested medical care for a variety of reasons including his diet, problems with his back, side, and shoulder pain, ice-pick headaches, seizures,

-28-

and a hernia.  However, Nurse Bradley's involvement was minor and she made no decisions regarding the medical care he should receive.  Instead, the treatment decisions were made by the physicians who treated the Plaintiff.

Nurse Bradley also contends she is entitled to qualified immunity.   Having concluded the Plaintiff failed to demonstrate the existence of a constitutional violation, Nurse Bradley is entitled to qualified immunity.  See Grayson, 454 F.3d at 808.  Accordingly, Nurse Bradley is entitled to summary judgment on the Plaintiff's medical care claim.

With respect to the non-medical Defendants, liability under § 1983 requires some personal or direct involvement in the alleged unconstitutional action.  See e.g., Ripon v. Ales, 21 F.3d 805, 808-09 (8th Cir. 1994).  There is nothing in the summary judgment record that suggests the non-medical Defendants were involved in the decision of what medical care should be ordered for inmates in general or for the Plaintiff in particular.  See Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); Mark v. Nix, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility).  General responsibility for supervising the WCDC is insufficient to establish personal involvement. Reynolds v. Dormice, 636 F.3d 976, 981 (8th Cir. 2011).   Accordingly, the non-medical Defendants are also entitled to summary judgment on this claim.

### (4).  Breach of Privacy

Plaintiff maintains his constitutional rights were violated when his name, picture, and criminal charges were put on the WCDC's public website.  Doc. 73-14 at 25.  Plaintiff believes

-29-

that individuals visiting the website presume you are arrested because you are guilty.  *Id.* at 26.

Plaintiff was charged with failure to register as a sex offender.  Plaintiff testified that while the

charges were eventually dropped, he lost his job as a result of the publication of the charges on

the website.  *See also* Doc. 73-14 at 28-30.  According to Plaintiff, Detective Schrock was

behind the original charges.  Plaintiff believes the Sheriff should be held liable on this claim

because he is responsible for information that is made public.

In Paul v. Davis, 424 U.S. 693 (1976), the police distributed a flyer captioned "active

shoplifters" to approximately 800 town merchants.  *Id.* at 695.  "The flyer consisted of five pages

of 'mug shot' photos, arranged alphabetically."  *Id.*  Plaintiff's name and photograph appeared

on the flyer because he had been arrested for shoplifting.  *Id.*  At the time the flyer was

distributed, the Plaintiff's guilt or innocence of the offense had not been determined.  *Id.* at 696.

Plaintiff's employer received the flyer and Plaintiff's supervisor called the Plaintiff in to "hear

his version of the events."  *Id.*  Plaintiff was not fired but was told "he 'had best not find himself

in a similar situation' in the future."  *Id.*

The Court noted that the Respondent "apparently believes that the Fourteenth

Amendment's Due Process Clause should *ex proprio vigore*[12] extend to him a right to be free of

injury wherever the State may be characterized as the tortfeasor."  *Id.* at 701 (footnote added).

The Court, in reviewing its prior decisions, concluded that "the weight of our decisions

establishes no constitutional doctrine converting every defamation by a public official into a

deprivation of liberty within the meaning of the Due Process Clause."  *Id.* at 702.

---

[12]By its own force.  Black's Law Dictionary (7th ed.1999).

The Court also noted that the prior decisions established that there must be an alteration in legal status **and** injury caused by the defamation before the Due Process Clause was implicated. *Id.* at 711. With respect to the case before it, the Court stated:

> Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a result of petitioners' actions. Rather, his interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages action. And any harm or injury to that interest, even where inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws.

*Id.* at 711-12.

In <u>Whalen v. Roe</u>, 429 U.S. 589, 599 (1977), the Court discussed a constitutionally protected "zone of privacy" involving two different kinds of interests. *Id.*, 429 U.S. at 598-599. The first "is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Id.* at 599.

This right has been variously characterized as the right to confidentiality or the right to privacy. <u>See e.g., Cooksey v. Boyer</u>, 289 F.3d 513, 515-516 (8th Cir. 2002). However, as pointed out by the Eighth Circuit in <u>Cooksey</u> "[n]ot every disclosure of personal information will implicate the constitutional right to privacy." *Id.*, 289 F.3d at 516. It noted it had "consistently held that to violate the constitutional right of privacy the information disclosed must be either a shocking degradation or an egregious humiliation . . . to further some specific state interest, or a flagrant bre[a]ch of a pledge of confidentiality which was instrumental in obtaining the personal information." *Id.* (citations and internal quotation marks omitted).

-31-

Here, Plaintiff concedes that the information regarding his criminal charges and the mug shot photos are matters of public record. The information put on the web page, therefore, cannot be considered confidential. Instead, Plaintiff argues the Defendants have made this publically available information more accessible by putting it on the Internet.

It has been recognized that "it is now common for state and federal organizations to publish matters of public record electronically. . . . Mugshots and booking information are part of the public record, and in most states members of the public who wish to look them up may freely do so." Michael Polatsek, Extortion Through the Public Record: Has the Internet Made Florida's Sunshine Law Too Bright, 66 Fla. L. Rev. 913, 915-16 (2014). Clearly there is no genuine issue of material fact as to whether the act of putting publicly available information on a web page constitutes a shocking degradation or an egregious humiliation or a flagrant breach of a pledge of confidentiality. Cooksey, 289 F.3d at 516; see also Sorrentino v. City of Philadelphia, No. CIV A. 96-6604, 1997 WL 597990 (E.D. Penn. 1997)(information related to criminal charges and an individual's mug shot photo is a matter of public record not subject to constitutional protection).

The Defendants also contend they are entitled to qualified immunity. Having concluded the Plaintiff failed to demonstrate the existence of a constitutional violation, Defendants are entitled to qualified immunity. See Grayson, 454 F.3d at 808 (8th Cir. 2006).

The Washington County Defendants are entitled to summary judgment on this claim.

AO72A
(Rev. 8/82)

**(5).  Denial of Access to Courts**

Plaintiff testified that Corporal Mulvaney tried to block or prevent the Plaintiff from filing this case.  When Plaintiff asked for information that he needed to file the complaint, such as the names of the Defendants and the dates of various occurrences, Plaintiff testified he was told that he could not have access to that information unless he had an attorney.

Electronic kiosk requests indicate Plaintiff attempted to obtain copies of jail records via the Arkansas Freedom of Information Act (FOIA).  Doc. 73-6 at 22-23.  In response, Corporal Mulvaney advised him that since he was incarcerated he could not obtain documents via the FOIA.  *Id.*  Corporal Mulvaney told the Plaintiff to have another person submit a FOIA request or to obtain the records through his attorney.  *Id.*  With respect to his certificate of account for his *in forma pauperis* application, Plaintiff was advised to give it to the floor deputy who would give it to Corporal Mulvaney for completion and that it would then be returned to him.

Plaintiff testified he was able to file this case and proceed with it.  However, he maintains it was difficult to start the process because the lack of a law library handicapped him.

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." Myers v. Hundley, 101 F.3d 542, 544 (8th Cir. 1996)(citing, Lewis v. Casey, 518 U.S. 343 (1996);  Bounds v. Smith, 430 U.S. 817, 821 (1977)).  In Myers, the Eighth Circuit stated that:

> [t]o protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared. Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail.  Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access

-33-

to the courts.  To state a claim that a law library or legal assistance program violates this right, inmates must assert that they suffered an actual injury to pending or contemplated legal claims.  Alleging theoretical inadequacies is insufficient.  Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.

Myers, 101 F.3d at 544 (citations omitted).

 In Cody v. Weber, 256 F. 3d 764 (8th Cir. 2001), the Eighth Circuit noted that the Supreme Court in Lewis v. Casey, 518 U.S. 343 (1996) and Bounds v. Smith, 430 U.S. 817 (1977), "determined that the right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'"  Cody, 256 F. 3d at 767-68 (quoting Lewis, 518 U.S. at 354-55).

In this case, Plaintiff states he was harmed because he could not obtain access to certain documents via the FOIA and had some unspecified difficulty in getting the account certificate for his IFP application.  However, Plaintiff was able to file his completed IFP application and the Complaint.  He missed no deadlines imposed by the Court.  No case was dismissed because he failed to file documents with the Court.  See e.g. Klinger v. Department of Corrections, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic).  As Plaintiff suffered no injury, this claim fails as a matter of law.

The Defendants also contend they are entitled to qualified immunity. Having concluded the Plaintiff failed to demonstrate the existence of a constitutional violation, Defendants are entitled to qualified immunity. See Grayson, 454 F.3d at 808 (8th Cir. 2006).

The Washington County Defendants are entitled to summary judgment on this claim.

### (6). Retaliation

Plaintiff testified that Detective Schrock retaliated against him because of complaints he filed against her. In support, Plaintiff has submitted a letter in which he argues Detective Schrock violated the provisions of Arkansas law in regard to the release and/or posting of information on sex offenders. Doc. 110-4 at pgs. 3-4. Copies of the letter were sent to Sheriff Helder and the SORSA (Sex Offender Screening & Risk Assessment Program). Plaintiff believes that Detective Schrock's retaliation against him resulted in the filing of failure to register charges against him in August or September of 2012.

Plaintiff testified that Detective Schrock retaliated against him by: withholding documents located in his briefcase that he needed for his divorce; failing to charge Plaintiff's neighbor when he stole the Plaintiff's dog; and failing to charge a trespasser who physically threatened the Plaintiff. Plaintiff, however, concedes there is no evidence Detective Schrock was involved in the incident involving the dog or the trespasser.

Plaintiff also maintains that Detective Schrock's attempts to build a case against him constitute retaliation. Doc. 110-4; see also Doc. 73-14 at 20. Plaintiff indicates that Detective Schrock is in the Criminal Investigation Division of the Washington County Sheriff's Office. He testified that it is his belief that Detective Schrock "made up" evidence about him and was working with his ex-wife, Teena Whitney, to "get rid" of him by "sending [him] to prison."

-35-

Plaintiff maintains Detective Schrock delayed a search for him on January 27, 2012, by insisting search and rescue do a complete search of his residence and vehicles for a suicide note. Doc. 115 at 3-7.  Plaintiff indicates he was on the back side of his property when he slipped and fell off a forty foot cliff.

In L.L. Nelson Entrs., Inc. v. City of St. Louis, Mo., 673 F.3d 799, 807-08 (8th Cir. 2012) the court stated that:

> [t]o establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that [he] engaged in a protected activity, (2) that the defendants responded with adverse action that would chill a person of ordinary firmness from continuing the activity, and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.

Id. (internal quotation marks and citations omitted).  "In brief, the plaintiff must show the official took the adverse action because the plaintiff engaged in protected speech."  Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004).   The filing of a grievance and the filing of a lawsuit is protected First Amendment activity.  Haynes v. Stephenson, 588 F.3d 1152, 1155-56 (8th Cir. 2009).

"To  avoid  summary  judgment,  [Plaintiff]  must  submit  affirmative  evidence  [of] retaliatory motive."  Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007)(internal quotation marks and citation omitted).   Because nearly every otherwise routine decision may potentially be viewed as a retaliatory act, it has been recognized that "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike."  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  Further, the courts have recognized that prison officials must have broad administrative authority.  Id..  For this reason, it has been said that

-36-

"courts must approach prisoner claims of retaliation with skepticism and particular care." <u>Dawes v. Walker</u>, 239 F.3d 489, 491 (2d Cir. 2001)(not every response to a prisoner's exercise of a constitutional right is actionable); <u>see also Atkinson v. Bohn</u>, 91 F.3d 1127, 1129 (8th Cir. 1996)(per curiam)(Speculative and conclusory allegations cannot support a retaliation claim).

In this case, Plaintiff has made only broad conclusory allegations and there is no record evidence from which an inference of a retaliatory motive could be drawn. Accordingly, Plaintiff has failed to establish a viable retaliation claim.

Detective Schrock also contends he is entitled to qualified immunity. Having concluded the Plaintiff failed to demonstrate the existence of a constitutional violation, Detective Schrock is entitled to qualified immunity. <u>See Grayson v. Ross</u>, 454 F.3d at 808 (8th Cir. 2006).

Detective Schrock is entitled to summary judgment on this claim.

### (7). Official Capacity Claims

A Plaintiff "seeking to impose liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." <u>Board of County Commissioners of Bryan County, Oklahoma v. Brown</u>, 520 U.S. 397, 403 (1997). "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." <u>Moyle v. Anderson</u>, 571 F.3d 814, 817-18 (8th Cir. 2009)(citation omitted). Plaintiff has made only conclusory allegations regarding the existence

-37-

of any unconstitutional policy or custom with respect to any of his claims.  Clearly, this falls far short of suggesting the existence of an unconstitutional policy, custom, or practice.

### IV.  Conclusion

For the reasons stated, I recommend that the summary judgment motion filed by Aramark (Doc. 66) be **GRANTED.**   Further, I recommend that the summary judgment motion filed by the Washington County Defendants (Doc. 71) be **GRANTED and this case be dismissed with prejudice.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 4th day of February 2016.

/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-38-